## ❧ Strohecker *against* Farmers' Bank.

The act of an attorney in fact must be limited to the terms of his power; if it be special, the principal is only bound by the execution of that special purpose.

A defendant in an execution is not chargeable with interest upon the debt due by him, beyond the return day of the execution, although the plaintiff does not receive his money, unless the delay was occasioned by the defendant himself.

ERROR to the common pleas of *Berks* county.

The Farmers' Bank of Reading against Leah Strohecker.   The facts of this case are fully detailed in the opinion of the Court, which was delivered by

Huston, J.—This case was a feigned issue to ascertain the right to money raised by a sheriff's sale of land, which had been the property of John Garber, deceased.   By agreement, if the plaintiff were entitled to any part, the jury to ascertain the sum and find the same in favour of the plaintiff; if the plaintiff is entitled to no part of the money, the jury to find for the defendant.

I shall state facts given in evidence in the order of time in which they occurred, without regard to whether shown by plaintiff or defendant.

John Garber died in Berks county before 1819, leaving two sons and four daughters, of whom Leah, the defendant, married to Daniel Strohecker, was the eldest, and Sophia, married to William

Sharman, was the youngest. On a petition by the eldest son the lands were appraised in different lots, A, B, C, D, E, F, G, H. The appraised value of tracts C and H was 10,668 dollars 25 cents. On the 6th of August 1819, tracts C and H were taken at the appraisement by and adjudged to William Sharman, attorney in fact for Daniel Strohecker, who, being married to the eldest daughter, had the first choice after the two sons.

On the same day a recognizance was given by William Sharman, attorney in fact for Daniel Strohecker, intermarried with Leah, one of the daughters of the deceased, for 21,000 dollars, to pay to the other heirs, &c.; conditioned, *that if the said William Sharman, his heirs, executors, or assigns, should pay to the respective heirs their respective shares, &c.*

Signed,     DANIEL STROHECKER.

By his attorney,     WILLIAM SHARMAN.

On the 28th of February 1820, deed of Daniel Strohecker and Leah his wife, to William Sharman, consideration 10,668 dollars 25 cents, for this land, acknowledged the same day. This deed recites the proceedings in the orphans' court, and reserves the proportionable part of the estate coming to Leah Strohecker. This recognizance and deed were objected to, because the power of attorney was not produced; but they were admitted, and there is no error in this, or if there was, it was cured by what was afterwards shown.

On the 6th of August 1819, the day the land was taken and recognizance given, William Sharman gave a bond "to Daniel Strohecker, married to one of the daughters of John Garber, for 3806 dollars, 49 cents;" it then recites the proceedings in the orphans' court, that the tract C was awarded to William Sharman, the recognizance by him to pay the other heirs, &c., and then is conditioned to pay Daniel Strohecker 1903 dollars 24 cents.

The defendant offered to prove in connection with this bond and proceedings stated, that, by an arrangement with Daniel Strohecker, Sharman took the property at the valuation actually for his own use. That Strohecker had given him the right of choice of the eldest daughter. This was rejected, and exception was taken; it ought to have been admitted; injustice often would be done if no evidence of previous facts and relations of the parties could be shown: for instance, a father purchases a tract of land in the name of his son, and pays for it, and is unable to pay his own debts, and fraud is alleged and would be found; but it may be proved that a relation had devised a sum of money to the son, that the father as guardian received such sum, and with it purchased the land in the name of the son.

The proof offered contradicted no deed or writing; it explained what was set out, though not in the most perspicuous manner, and went to show, connected with the writings, the nature of Leah's claim. Daniel Strohecker died in 1821.

VI.—N

On the 31st of August 1820, Daniel and Leah Strohecker gave a power of attorney to John Strohecker, to assign, transfer, and set over a bond dated 6th of August 1819, for 1903 dollars 24 cents, to the Farmers' Bank of Reading, in satisfaction in whole or in part (as the case may be) of a note due said bank, by John Strohecker, &c., &c. This was acknowledged the same day and recorded the 9th of September 1820.

On the 14th of September 1820, John assigned, by virtue of this power and referring to it as recorded, the bond of the 6th of August 1819, and all moneys due and to become due thereon, with a personal covenant from himself, in case the said bond could not be recovered, that then he would pay, &c.

This bond, power of attorney and assignment, were produced by the bank on notice.

Old John Garber died indebted; judgment was obtained for 7919 dollars 35 cents, and other land of his sold, which still left 1270 dollars unpaid, for which a levy was made on tract C, which was sold for 7400 dollars; this in 1830, but the money was not paid until 1835.

In the mean time the bank had sued William Sharman on the assigned bond, and obtained judgment in 1824; this was opened by the court, but judgment to remain as security; a final judgment in 1835 for 2685 dollars 81 cents. The contest is for this money.

After the records and papers had been given in evidence, the defendant called a witness to prove that the power of attorney from Daniel and Leah Strohecker to John, was given on a Sunday, and therefore void. There were two subscribing witnesses to this power. They were not called, nor their absence accounted for. We think this a case in which their evidence should have been given. The point, however, may not be material, as this court considers the cause. The defendant also called a clerk in the bank to prove the note of John Strohecker, and that it was the particular note the money due on bond was to pay; also to prove that John Strohecker was and is a stockholder in the bank, which has a lien on that stock for its security; also, that John Garber, deceased, was the original indorser on the note of John Strohecker. The court rejected the evidence. These offers were made with a view to turn the bank to its security on the stock of Strohecker in preference to the estate of either John Garber, or Daniel, or Leah Strohecker. In both these there was error.

The plaintiff called John S. Hiester, who stated, "I was a witness to this assignment. The bond was offered by John Strohecker, at the bank in payment of his debts; he called at the bank and wanted me to lay it before the directors; he wanted out of it, for his own private use, 80 dollars. I laid it before the directors, who agreed to take it in payment of his debts to the bank, and allow him 80 dollars, and left it to the officers to conclude the transaction. I told this to Strohecker, and that before an assignment was made,

he must bring Sharman to the bank. He brought Sharman, who said he did owe the money and would pay it if the bank took the assignment; and he did pay me, as cashier, 750 dollars, on this bond. I then left the bank."

In answer to the questions by defendant, he said, John Strohecker owed several notes. There were two to which this bond was applied; may be three. The amount of the bond, after deducting the 80 dollars, did not pay all his debts to the bank.

I think Garber's administrators, David and John Garber, were the indorsers on the notes paid, but am not certain; cannot say whether Daniel Strohecker was an indorser on any of the notes of John Strohecker.

The material point in this cause, the court thinks, is the power of attorney, its nature and extent, including the validity of the acts done under it. The difference between a general power to act for the principal in all cases, and a special power to act for him in a particular case is settled, by many decisions, and is obvious to and well understood by the men of business and sense, who are not lawyers; yet cases have and will arise in which, from the nature of the business, difficulties occurr as to the extent of a power in question, and of course, of the effect of acts done under it. Sometimes parol evidence of the previous relation and situation of the parties, or of the subsequent affirmance of the acts done, render the case more difficult and sometimes make it of easier solution, and the blending of what may thus be sworn to with what is written may draw all to the decision of a jury. We have here nothing more than that John and Daniel Strohecker were relations. We know of no reason beyond relationship, why Daniel agreed that a bond due to him, should be uesd as a security for John. We do not even know whether Daniel was an indorser on a note in that bank, for John. And the death of Daniel, in 1821, left little time for subsequent confirmation, and nothing of the kind is alleged. It has been said of this power of attorney, (as has been and will be said of all writings contested in court,) that it is not so explicit as it was possible to make it. This court think, however, that it cannot easily be misunderstood. It recites that there exists a bond from William Sharman to Daniel, which bond it authorizes John *to assign, transfer, and set over to the bank, "in satisfaction in part or in whole,* (as the case may be,) *of a note due said Farmers' Bank, by the said John Strohecker,* and further to do, execute, perform, and finish, all and singular, the acts, matters, and things which shall be expedient and necessary, touching and concerning the premises," as fully, &c., &c. The bond was to be used to pay, or secure the payment of a note due by John to the bank. Who will say this is equivalent to an authority to assign it to pay all notes due by John, or to come due by John, or to secure future loans and advances of money to John? The bank or its officers saw the power, the assignment refers to the power, and it

will not do, where a special power is shown and referred to, to permit the bank to suppose a general power, not shown or pretended at the time, and now shelter themselves under what had no existence. John showed his authority from Daniel; beyond that, he could not bind Daniel. It is probable he did not pretend to do so, for the bank took a special covenant from John, binding himself personally.

If Daniel had been the original debtor to the bank, there might have been some pretext of an equity against him. Nothing of the kind appears; he may have been an indorser on a note, if not, he is a guarantor of a note, not a principal, but a surety; the money not advanced on his credit; and if not liable at law, the bank cannot pretend to any claim against him in equity, much less can John have any such claim under the facts before us, and the suit is evidently for John's use, or to save John from paying this money.

The bank then ought to show that there was a note of John's due, whether, at the date of the power there was more than one note of John's due, to show whether there was any note on which Daniel was liable, which he was interested to have satisfied. And notwithstanding, what John may have said, in the absence of Daniel, its claim must be limited, as to this bond, to some one note, and if there is any thing on which to decide, the jury must say on what note; and whether the note intended has been in whole or part satisfied, by the 750 dollars, paid in by Sharman. But the bank cannot hold this bond for all the debts past and present, of John Strohecker, or for more than some one note to be ascertained as above. The power is special, the object was special; the bank knew this and could not, by an agreement with the attorney, make it general; nor when they saw a special authority, under seal, can they be permitted to allege and shelter themselves under a supposed general authority, of which there is no particle of evidence.

The cases cited leave no doubt of the law on this subject.

Some other things occurred in the discussion of this cause. It was said, that the universal practice, in Berks county, is to calculate interest against the defendant in the execution, until the money is paid into court or to the plaintiff, whose judgment entitles him to it. If this is so, it is time this practice was changed. When a debtor's goods or land is sold for a certain sum, and the execution is returned, property sold, or except in one case returnable, the debt is paid to the amount of the sum produced, after payment of costs. I say nothing of the case where the defendant in the execution appears at the return of the writ and applies to stay the return, or set aside the sale; but in other cases it is the duty of the plaintiff to call for a return of the writ, if the sheriff returns "property sold to A., who has not paid, therefore, unsold for want of buyers." I say nothing of that case; if such return is acquiesced in or affirmed, the defendant enjoys his land; but if the de-

[Strohecker v. Farmers' Bank.]

fendant makes no objection, the return day of the writ is the period at which the defendant ceases to be liable for the debt and interest, to the amount of the proceeds of sale.   No matter if the sheriff runs away, or becomes insolvent, or indulges a purchaser, the defendant in the execution must not bear the loss; if the sheriff keeps back the money the creditor must, if he can, get interest from the sheriff; if the purchaser delays to pay, he may be resorted to for interest on his bid; if contending creditors keep the money in court, the defendant is not to suffer for this; his property is gone from him, and unless he delays the payment and the deed, his debt is paid, and his liability to interest on the amount of the proceeds of sale must cease.

Judgment reversed, and a *venire facias de novo* awarded.

*Hoffman* and *Greenough*, for plaintiff in error.
*H. Smith*, for defendant in error.